UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JOHANNA ORTEGA,                                   :

                 Plaintiff,                   :            16 Civ. 5999 (AJP)

           -against-                        :            **OPINION & ORDER**

NANCY A. BERRYHILL,                               :
Acting Commissioner of Social Security,
                              :

                 Defendant.                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**ANDREW J. PECK, United States Magistrate Judge:**

           Plaintiff Johanna Ortega, represented by counsel, brings this action pursuant to

§ 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the

Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB").

(Dkt. No. 2: Compl.)  Presently before the Court are the parties' cross motions for judgment on the

pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 15: Ortega Notice of Mot.; Dkt. No. 17:

Comm'r Notice of Mot.)  The parties have consented to decision of the case by a United States

Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. No. 9.)

           For the reasons set forth below, the Commissioner's motion for judgment on the

pleadings (Dkt. No. 17) is <u>GRANTED</u> and Ortega's motion (Dkt. No. 15) is <u>DENIED</u>.

<u>FACTS</u>

**<u>Procedural Background</u>**

           Ortega filed for benefits on January 22, 2013, alleging a disability onset date of

August 1, 2011.  (Dkt. No. 11: Administrative Record ("R.") 95-96, 200-01.)  The Social Security

Administration ("SSA") denied Ortega's application.  (R. 94-105.)  On October 3, 2014, Ortega,

represented by counsel, had a hearing before Administrative Law Judge ("ALJ") Robert Gonzalez. (R. 42-93.)  On December 29, 2014, ALJ Gonzalez issued a written decision finding Ortega not disabled within the meaning of the Social Security Act.  (R. 16-33.)  ALJ Gonzalez's decision became the Commissioner's final decision when the Appeals Council denied review on May 31, 2016.  (R. 1-3.)

**<u>Non-Medical Evidence and Testimony</u>**

Born on February 14, 1978, Ortega was thirty-three years old at the alleged August 1, 2011 onset of her disability.  (R. 200-01.)  Ortega previously worked as a titled receptionist, unit clerk, and medical record coder.  (R. 63-64, 66, 76-77, 245.)  After becoming pregnant, she took a year off and obtained a position as a bus monitor.  (R. 64-66, 245.)  Ortega testified that she held this job for two school years until she failed her physical, prompting the school not to renew her employment for the subsequent year.  (R. 64-66.)

On February 25, 2013, Ortega completed a function report.  (R. 229-44.)  She reported caring for her two daughters with the assistance of her husband or immediate family.  (R. 229-30.)  She reads, watches television, and solves crossword puzzles.  (R. 233.)  She has no problems with personal care.  (R. 230-31.)  She prepares simple meals three to four times a week. (R. 231.)  Occasionally, she will be unable to fix her meal because of excessive pain in her hands. (Id.)  She performs simple household chores, but requires numerous breaks of at least an hour, and can travel by car for short distances.  (R. 232-33.)  She shops for groceries once a week but has someone accompany her.  (Id.)  She engages in daily phone conversations.  (R. 234.)  She reports suffering from high anxiety, impatience, and irritability.  (Id.)  However, she reports that she does not have issues interacting with authority figures nor has she lost a job because of an inability to get along with people.  (R. 236.)  Ortega reported that she could stand for only 20 minutes at a time

before needing to sit, and could sit for 40-60 minutes at a time but must walk around after sitting for 60 minutes. (R. 234-25.)

At the October 3, 2014 hearing, Ortega testified that she suffered from asthma, rheumatoid arthritis ("RA"), fibromyalgia, acid reflux, irritable bowl syndrome ("IBS"), and migraines. (R. 46-53.) She reported being treated with Plaquenil for RA, steroids for asthma, Percocet for fibormyalgia, Omeprazole for acid reflux, and Xanax and Zoloft for emotional problems. (Id.) Her RA produced "burning" and "numbing" sensations in her hands, wrists, and fingers, causing an inability to bend at the joints and an inability to hold or carry anything. (R. 48.) Disc problems in her back prevented her from standing up straight and produced pain radiating to her arms and legs when sitting or standing for long periods of time. (R. 50-51.) Ortega testified that she suffered from stress-induced migraine headaches at least five times a month lasting at least twenty-four hours. (R. 52-53.) Ortega occasionally was unable to leave her bed due to severe hand and back pain. (R. 53.) Ortega testified to being unable to walk her child to the bus stop (R. 56), or stand for more than ten minutes engaging in the same task without having to sit due to back pain (R. 59). She testified to being prone to irritability and thoughts of violence when engaging in typical interactions at work or at the grocery store. (R. 68-72.) Ortega claimed that if she were required to return to work, her short temper would lead to her being fired or jailed. (R. 71.)

At the hearing, vocational expert Sugi Komarov testified that an individual with Ortega's vocational profile and residual functional capacity would be unable to perform any of her previous work positions, but could be employed as an addresser, document preparer, semi-conductor bonder, or final assembler. (R. 78.) These jobs are all unskilled sedentary positions that exist in significant numbers in the national economy and do not permit an option to perform from either a seated or standing position. (R. 78, 88-89.) When asked whether this same hypothetical individual

could maintain employment being off task ten percent of the time, Komarov testified that such an individual would be unable to maintain employment. (R. 78-79.) Komarov also testified that being absent more than one day per month would preclude an individual from maintaining employment. (R. 79-80.)

## Medical Evidence Before the ALJ

### 2011

On August 8, 2011, Ortega went to the Nyack Hospital emergency department complaining of "a two day history of progressively worsening [right lower quadrant] abdominal pain . . . with fever, chills, nausea, and non-bloody vomiting." (R. 783-84.) Ortega reported that these symptoms arose several days after an appendectomy performed in Ecuador on July 25, 2011. (R. 784.) Dr. Brenda Liu diagnosed these issues as fever, splenomegaly, acute conjunctivitis, and acute viral illness. (R. 786.) Dr. Liu determined that no additional testing was necessary and discharged Ortega on the same day. (Id.)

On August 31, 2011, Ortega was treated by Dr. Nihal Sandhu, who diagnosed Ortega as having asthmatic bronchitis, abdominal pain, gastroesophageal reflux disease ("GERD"), and bronchitis. (R. 668.) For treatment, Dr. Sandhu prescribed Cipro, Omperazole, and Bentyl. (Id.) On December 7, 2011, Dr. Sandhu performed a pulmonary function analysis ("PFA") and diagnosed moderate obstructive airway disease. (R. 661-62, 665.) Dr. Sandhu prescribed Z-pack and Advair. (R. 665.) On December 12, 2011, Ortega reported that mold covered the walls of her home and complained of shortness of breath, dyspnea, and wheezing. (R. 660.) Dr. Sandhu found wheezing and rhonchi, but no evidence of gallop, rub, or shortness of breath. (Id.) He prescribed Singulair, Flonase nasal spray, and prednisone. (Id.)

**2012**

On January 18, 2012, Ortega was seen by Dr. David Dorf for symptoms of recurrent migraine headaches, lower back pain, asthma, and gastritis. (R. 417.) Physical examination revealed that her musculoskeletal and psychiatric conditions were normal. (Id.) On January 27, 2012, Ortega returned to Dr. Sandhu, complaining of shortness of breath, dyspnea, wheezing, phlegm, and coughing. (R. 658.) After administering another PFA, Dr. Sandhu diagnosed her symptoms as severe bronchial asthma, severe GERD, and mold allergies. (Id.)

On February 16, 2012, Ortega went to the Nyack emergency department for shortness of breath. (R. 774, 782.) Chest x-rays revealed clear lungs and no abnormalities in her heart size or pulmonary vessel caliber. (R. 782.) Ortega returned on February 24, 2012 for chest pain. (R. 769.) X-rays of her right ribs showed no evidence of rib fracture or any acute abnormalities. (R. 772.) Dr. Liu diagnosed Ortega with muscle strain and chest wall pain. (R. 770-71.)

On March 2, 2012, Ortega returned to Dr. Sandhu complaining of right chest pain, shortness of breath, dyspnea, wheezing, coughing, and phlegm. (R. 653.) Dr. Sandhu maintained his diagnosis of severe bronchitis and GERD, and he prescribed Protonix, Bentyl, Singulair, and Percocet. (R. 653.) On March 15, 2012, Dr. Dorf administered a complete abdominal ultrasound that revealed no abnormalities. (R. 437.) On April 6, 2012, Dr. Sandhu diagnosed Ortega with bronchial asthma, anxiety neurosis and panic attacks, prescribed Xanax, and advised Ortega to seek psychiatric assistance. (R. 651.)

On April 9, 2012, Ortega returned to the Nyack emergency department for nausea, abdominal pain, and vomiting. (R. 762.) Ortega was treated with Pepcid, IV hydration, and Zofran and released after 3.5 hours. (R. 763-64.) On April 13, 2012, Ortega underwent a colonoscopy with biopsy and polypectomy. (R. 757.) The procedure revealed two polyps, which were resected, and

an otherwise normal colon. (Id.) On May 11, 2012, Dr. Sandhu diagnosed Ortega's complaints of severe coughing as severe bronchial asthma, allergies, furrowed tongue, and anxiety. (R. 650.) On May 22, 2012, Dr. Dorf examined Ortega and noted that she had a history of smoking. (R. 415.) His examination revealed no issues of concern. (Id.)

On June 18, 2012, Ortega went to the Nyack emergency department for "sharp" pain in her left back and chest. (R. 748.) Physical examination showed that Ortega suffered wheezing but had no rales or rhonchi. (Id.) Chest X-rays revealed no acute pulmonary disease, but showed a healing right fourth rib fracture. (R. 753.) Dr. Nava Bak diagnosed atypical chest pain and ashtma exacerbation. (R. 749.) Ortega requested to be discharged, suffering only "mild painful distress." (R. 748.)

On June 22, 2012, Ortega returned to the Nyack emergency department for "worsening pain when she coughs." (R. 738.) Ortega reported that she "cries every time she coughs." (Id.) Her physical examination revealed wheezing, diminished breath sounds, and reproducible pinpoint tenderness over her left scapula. (Id.) Ortega was diagnosed with a rib fracture and asthma. (R. 740.) After several hours, Ortega's wheezing improved and she was discharged. (Id.) On June 25, 2012, Dr. Dorf recommended that Ortega follow-up with Dr. Sandhu. (R. 414.)

On July 6, 2012, Ortega returned to the Nyack emergency department for gradual onset of headache associated with persistent chest pain, coughing, and wheezing. (R. 631, 731.) Ortega reoprted smoking half a pack of cigarettes a day. (R. 631.) Physical examination revealed bilateral expiratory wheezing that was worse on the right side and right ribcage tenderness, but no rales, rhonchi, or rubs. (R. 632.) Chest x-rays showed clear lungs and no bone deconstruction. (R. 639.) Ortega was treated with aerosolized albuterol and reported significant relief. (R. 634.) Dr.

Bak reported that Ortega appeared to be in less emotional distress and that her pain had resolved. (Id.) Dr. Bak diagnosed Ortega with asthma, chest wall pain, and headache. (Id.)

On July 9, 2012, Ortega began treatment with Dr. Meir Malmazada, who prescribed Percocet, a Pro Air inhaler, Singular, an Advair inhaler and Medrol, Carafate and omperazole. (R. 628-30.) Additionally, Dr. Malmazada prescribed Zithromax on July 16, 2012. (R. 626-27.) On July 30, 2012, Ortega complained of wheezing and shortness of breath, but did not report coughing. (R. 620.) Two x-rays performed on July 31, 2012 revealed no acute pulmonary process and normal cardiac size. (R. 619.)

On August 1, 2012, Ortega returned to the Nyack emergency department for shortness of breath. (R. 606.) During her physical examination, Ortega had a brief coughing fit and demonstrated wheezing in her left upper lobe. (R. 606-07.) Chest x-rays showed clear lung fields, no acute pulmonary process, and normal cardiac size. (R. 614.) Ortega declined further medical evaluation and treatment against Dr. Bak's advice and was discharged. (R. 610.) Ortega returned the next day for shortness of breath. (R. 599-603.) She was treated by Dr. Malmazada, who reported her symptoms as wheezing, coughing, sputum, rhinorrhea, sore throat, post-nasal drip, pleuritic chest pain, fever and chills. (R. 599.) Physical examination showed signs of bilateral expiratory wheezes, with no rhonchi or rales. (Id.) Additionally, in response to complaints of back pain, Ortega underwent an x-ray of her lumbar spine that revealed findings of mild levoscoliosis, and facet arthritis at L5 to S1. (R. 601.) Dr. Malmazada diagnosed Ortega with presumed pertussis, exacerbation of bronchial asthma, acute purulent bronchitis, anxiety, lower back pain with arthritis, and anxiety. (Id.) Ortega was discharged on August 8, 2012. (Id.) On August 13, 2012, Ortega followed up with Dr. Malmazada, who wrote a "To Whom it May Concern" note that Ortega was unable to walk a distance of 200 feet. (R. 598.)

On August 29, 2012, Dr. Mark Medici conducted an orthopedic evaluation of Ortega due to complaints of neck and lower back pain of one-year duration radiating to the extremities bilaterally with numbness and tingling. (R. 308-12.) Ortega appeared well groomed with no apparent acute or chronic distress, and normal communication. (R. 309.) She had normal gait and station, but had a diminished range of motion of her cervical spine. (Id.) Physical examination revealed tenderness throughout her cervical, thoracic, and lumbar spine. (Id.) Additionally, Ortega suffered mild pain in her posterior neck, moderate low back pain on flexion and extension, and mild low back pain on lateral flexion. (Id.) Ortega also experienced decreased sensation in her left arm and left leg. (Id.) Dr. Medici diagnosed Ortega with cervical degenerative disc disease, lumbar degenerative disc disease, and lumbar and cervical radiculopathy. (R. 310.) On August 31, Ortega underwent a magnetic resonance imaging ("MRI") of her lumbar and cervical spine. (R. 318-19.) The results showed a small central disc protrusion and annular tear at L3-4 and L4-5 with minimal indentation of the thecal sac, mild disc degeneration and annular bulge at L5-S-1, and small right paracentral disc herniation at C4-5 reaching, but not compressing, the cord. (R. 319-20.)

On September 4, 2012, Ortega was seen by Dr. Anju Varghese for chronic pain in the low back, legs, arms, hips, knees and ankles. (R. 462.) Physical examination revealed tenderness along the lumbar spine and mild restrictions in range of motion in her shoulders and hip joints. (Id.) There was no significant joint tenderness, joint synovitis, or effusion. (Id.) On September 17, 2012, Dr. Varghese again saw Ortega, who complained of joint pain, joint swelling, and morning stiffness. (R. 859.) While she appeared well on physical examination, her musculoskeletal examination showed signs of synovitis. (Id.)

On September 18, 2012, Dr. Dorf treated Ortega and reported that her asthma was stable. (R. 412.) On September 19, 2012, Ortega went to the Nyack emergency department, with

complaints of abdominal pain, nausea, vomiting, and a low grade fever. (R. 688.) Physical examination showed no rales, rhonchi, or any evidence of abnormal breathing sounds. (Id.) A CT scan of the abdomen and pelvis produced unremarkable results. (R. 695.) Ortega was discharged 2.5 hours later, given her positive response to the treatment provided. (R. 689.) Ortega returned with complaints of shortness of breath, chest pain, pain taking a deep breath, coughing, dizziness, and migraine headaches. (R. 678.) Physical examination revealed end expiratory wheezes. (R. 679.) Chest x-rays showed no signs of acute cardiopulmonary disease. (R. 685.) Dr. Liu diagnosed Ortega with acute bronchitis. (R. 680.) Ortega was discharged the same day when her condition improved. (Id.) On September 25, 2012, Ortega underwent an abdominal and pelvic CT exam, which showed no evidence of active disease. (R. 432.) On October 4, 2012, Dr. Malmazada prescribed Percocet, Flagyl, Augmentin and Mentrol. (R. 583-84.)

On October 8, 2012, Ortega sought pain management treatment from Dr. Sireen Gopal, complaining of back and neck pain radiating to her extremities. (R. 361-63.) Physical examination showed an alert and oriented general appearance with normal gait and station. (R. 362.) She possessed limited range of motion of her lumbar spine and neck with myofascial trigger points at both sides of the upper trapezius and thoracic paraspinal area. (Id.) However, Ortega retained normal strength for her upper and lower extremities, normal range of motion of her shoulder joints, and brisk reflexes. (Id.) Dr. Gopal diagnosed Ortega with lumbar radiculopathy, cervical radiculitis, lumbar spine herniated nucleus pulposus, sacroiliitis, and unspecified myalgia and myositis. (R. 362-63.) Dr. Gopal prescribed Lyrica and performed a sacroiliac joint injection on October 10, 2012. (R. 358-60.)

On October 24, 2012, Ortega returned to Dr. Medici to evaluate bilateral hip pain. (R. 314-17.) Physical examination revealed that she had mild to moderate tenderness with full range

of motion in her right hip and thigh, and mild to moderate tenderness with mildly limited range of motion in her left hip and thigh. (R. 315.) Dr. Medici diagnosed Ortega with bursitis of the hip. (R. 315-16.) Dr. Medici prescribed Vicodin and provided a steroid injection. (R. 316.)

On November 16, 2012, Ortega returned to Dr. Gopal with complaints of worsening back and neck pain. (R. 355.) Dr. Gopal prescribed Percocet and Gabapentin. (R. 356.) On November 20, 2012, Ortega reported that she ceased taking Gabapentin because it prompted vomiting and headaches. (R. 858.) Physical examination showed Ortega had a clear chest. (Id.) Dr. Varghese advised her to continue treatment with Plaquenil. (Id.) On December 5, 2012, Dr. Gopal administered a lumbar epidural steroid injection. (R. 352-54.)

**2013**

On January 7, 2013, Dr. Gopal administered another lumbar epidural. (R. 349-51.) For this procedure, Ortega reported that her current medication consisted of Nortriptyline, Percocet, Zoloft and Xanax. (R. 349.) Physical examination showed her general appearance to be alert and oriented with normal mood and gait, diffuse swelling in her upper back, tenderness without muscle spasms at the bilateral lumbar facet joints, and limited range of motion in her lower back. (Id.) Additionally, Ortega had limited range of motion in her cervical spine with myofascial trigger points in the upper trapezius and thoracic paraspinal area. (R. 350.) Dr. Gopal also noted that Ortega had normal motor strength and brisk reflexes. (R. 828-29.) For treatment, Dr. Gopal prescribed interlaminar epidural injections. (R. 350.)

On January 11, 2013, Dr. Aleksandr Rakhlin performed a diagnostic laparoscopy and incisional hernia repair. (R. 367-70.) On January 31, 2013, Ortega reported feeling "reassured" and was healing well post-surgery. (R. 569.)

On January 22, 2013, Ortega returned to Dr. Varghese with complaints of depression

and increased pain, swelling, and stiffness after exhausting her Plaquenil. (R. 857.) Physical examination showed indications of synovitis and low titer ribonucleoprotein ("RNP") antibodies. (R. 857.) Dr. Varghese recommended continued treatment with Plaquenil. (Id.) On the same day, Ortega also visited Dr. Malmazada to evaluate a fever and sore throat. (R. 563-66.) Dr. Malmazada diagnosed Ortega with acute sinusitis and bronchitis. (R. 563.) On February 5, 2013, Ortega's fever had subsided. (R. 560.)

On February 18, 2013, Ortega returned to Dr. Gopal complaining that her pain had not improved since her last visit. (R. 344.) Dr. Gopal prescribed Tizanidine, Nucynta, and discontinued Percocet. (R. 345.) An electrodiagnostic study of Ortega's nerves revealed no evidence of cervical radiculopathy or ulnar neuropathy. (R. 337-40.)

On March 5, 2013, Dr. Malmazada diagnosed Ortega with chronic obstructive pulmonary disease ("COPD") and acute bronchitis, and prescribed prednisone, Asmanex, a Foradil aerolizer and Promethazine. (R. 556-58.) A March 12, 2013 pulmonary function analysis showed a mild response to bronchodilator. (R. 552-55.) On March 18, 2013, Ortega reported that her neck pain had increased and her lower back and knee pain remained at the same intensity. (R. 823.) Dr. Gopal advised that the most effective treatment from a pain management perspective would be weight loss. (R. 824.) On March 25, 2013, Ortega consulted Dr. Varghese with complaints of tremendous pain in all her joints with no significant joint swelling, affecting her ability to take care of her child. (R. 856.) Dr. Varghese prescribed Leflunomide and Plaquenil for her pain. (Id.)

On April 15, 2013, Dr. Fredelyn Damari performed a psychiatric evaluation of Ortega. (R. 371-75.) Ortega reported suffering from anxiety, agitation, and depression for over a year, but did not report any panic attacks, manic symptomatology, thought disorder symptoms, or cognitive symptomatology or deficits. (R. 371-72.) She reported that her current medications were

Plaquenil, Sertraline, Xanax, Asmanex Twisthaler, Foradil, Percocet, and Tizanidine. (R. 371.) Ortega could dress, bathe, and groom herself, cooked simple meals roughly four times a week, shopped when accompanied, drove a little, socialized with her family, and watched TV. (R. 373.) Her mental status examination revealed a cooperative demeanor, responsiveness to questions, and adequate social skills. (R. 372.) Her recent and remote memory skills were mildly impaired and her intellectual functioning was below average. (R. 373.) Ortega was able to comprehend and act upon simple instructions, perform simple tasks independently, maintain attention and concentration, learn new tasks, and make appropriate decisions. (R. 374.) She had mild impairments in the ability to maintain a schedule, perform complex tasks independently, relate adequately with others, and appropriately deal with stress. (Id.) Dr. Damari concluded that the evaluation findings were consistent with stress related issues, but did not seem significant enough to interfere with her ability to function on a daily basis. (Id.) Dr. Damari diagnosed Ortega with adjustment disorder and pain disorder related to medical conditions. (Id.)

On April 17, 2013, Dr. John Fkiaras conducted a consultative internal medicine examination of Ortega for the Division of Disability Determination. (R. 376-80.) Ortega's complaints consisted of general myalgias, deep soreness, cervical neck pain, low back pain, daily cough, and generalized joint pain, especially in her wrists and hands bilaterally. (R. 376.) Her medications were Plaquenil, Leflunomide, Sertraline, Xanax, Asmanex inhaled, Foradil inhaled, Percocet, and Tizanidine. (R. 377.) Ortega cooks four times a week, cleans once or twice a week, shops weekly with assistance, cares for her children daily with assistance, grooms herself daily, watches TV, reads, and listens to the radio. (Id.) Physical examination revealed that Ortega was in no acute distress, but had a slow gait, could not walk on heels and toes, and could only squat one third of the way down. (R. 378.) She did not use any assistive devices and did not require any help

changing for the exam or getting on and off the exam table. (Id.) Her chest and lungs were clear to auscultation and operated in a normal diaphragmatic motion. (Id.) Her cervical spine rotation to the left and lumbar spine flexion were slightly impaired. (Id.) Supine straight leg raising was positive on the left and negative on the right. (R. 378-79.) She had full range of motion of her hips, knees, and ankles. (R. 379.) Her joints were stable and nontender. (Id.) She had one trigger point evident in the left trapezius muscle and demonstrated no signs of muscle atrophy. (Id.) Dr. Fkiaras diagnosed Ortega with fibromyalgia, rheumatoid arthritis, cervical neck pain, low back pain, asthma, and chronic obstructive pulmonary disease/emphysema. (Id.) Dr. Fkiaras concluded that Ortega was unable to engage in any heavy lifting, carrying, pushing, pulling, squatting, kneeling, or crouching. (R. 380.) Dr. Fkiaras recommended that Ortega also avoid activities that require prolonged standing, smoke, dust, and known respiratory irritants. (Id.) He also asserted that Ortega had a moderate-to-marked limitation in bending and moderate limitation in climbing stairs. (Id.)

On April 21, 2013, Ortega returned to Dr. Varghese, reporting that she continued to experience "some pain," but improved condition of her hips and knees. (R. 855.) Dr. Varghese noted that treatment with Leflunomide appeared to improve Ortega's ailments. (Id.) On May 6, 2013, Ortega visited Dr. Malmazada with complaints of shortness of breath. (R. 548.) Dr. Malmazada prescribed omeprazole, Medrol and doxycycline. (R. 549.)

On May 10, 2013, state agency physician H. Ferrin opined that Ortega was able to remember locations and work-like procedures, and understand and remember simple instructions. (R. 102.) Dr. Ferrin also noted that Ortega suffered mild limitations in the following abilities: understanding and remembering detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, sustaining an ordinary routine without special supervision,

working in coordination with others, making simple decisions, accepting criticism from supervisors, maintaining socially appropriate behavior, and using public transportation. (R. 102-03.) Dr. Ferrin concluded that Ortega may benefit from a work environment where she is not required to have intensive contact with the public, but appeared capable of routine interactions with coworkers and supervisors. (R. 104.)

On May 13, 2013, Ortega visited Dr. Malmazada with complaints of coughing, shortness of breath and dyspnea on exertion. (R. 545.) Dr. Malmazada prescribed Pro Air, prednisone, promethazine, Foradil, Asmanex, and Singular. (R. 545-47.) Chest x-rays revealed no acute abnormalities. (R. 544.)

On May 20, 2013, Ortega complained to Dr. Gopal of increased pain in the knees, neck, and back. (R. 817.) The pain radiated to her extremities and was accompanied with numbness and tingling, aggravated by prolonged periods of sitting, walking, standing or bending. (Id.) Physical examination revealed normal mood and gait, tenderness without muscle spasms and limited range of motion of Ortega's lumbar spine, myofascial trigger points in the upper trapezius and thoracic paraspinal area, decreased range of motion in her left shoulder and brisk reflexes. (R. 818.) On June 20, 2013, Ortega received a lumbar paravertebral facet joint injection for treatment. (R. 814-16.)

On June 27, 2013, Ortega went to the Nyack emergency department with complaints of wheezing, coughing, and shortness of breath. (R. 534-35.) She reported smoking daily. (Id.) Her chest x-rays revealed no acute findings and no significant interval changes from the January 4, 2013 study. (R. 537.) Ortega was treated with Duoneb and was discharged after feeling "much better" with no signs of wheezing. (R. 536.) On July 2, 2013, Dr. Malmazada prescribed Biaxin and promethezine for treatment. (R. 531-33.)

On August 1, 2013, Dr. Deutsch saw Ortega for an orthopedic evaluation. (R. 458.) Dr. Deutsch noted that Ortega was in no overt discomfort but weighed 204 pounds. (Id.) Inspection of the neck revealed tenderness at the right strap paracervical and upper trapezial muscle, and medial scapular borders, with limited range of motion. (Id.) Neurological examination of the upper extremities revealed slight sensory loss in three fingers. (Id.) X-rays of the cervical spine revealed reversal of the normal lordosis, but no degenerative changes or narrowed disc spaces. (R. 459.) Dr. Deutsch diagnosed Ortega with cervical strain, rheumatoid arthritis, and possibly carpal tunnel syndrome. (Id.)

On August 5, 2013, Dr. Gopal administered a trigger point injection and recommended a referral for spine surgery. (R. 812-13.) Dr. Gopal noted that Ortega had not improved with conservative treatments and that consideration for corrective spine surgery was prudent. (R. 812.) Dr. Gopal opined that Ortega could lift up to ten pounds and walk more than one block. (R. 811.) In August, Ortega followed up with Dr. Varghese complaining of extreme fatigue. (R. 853.) She did not, however, report any joint pain or stiffness, with the exception of a few hours in the morning. (Id.)

On August 27, 2013, Ortega visited Dr. Dorf with complaints of three days of sinusitis. (R. 411.) In October 2013, Ortega followed up with Dr. Varghese, reporting improved condition of her joints and several hours of stiffness in the morning. (R. 852.) Ortega consulted Dr. Varghese once more in December, reporting joint tenderness. (R. 851.) Dr. Varghese concluded that Ortega's rheumatoid arthritis was relatively stable. (Id.)

**2014**

On February 10, 2014, Ortega returned to Dr. Malmazada with complaints of shortness of breath, sore throat, post nasal drip, and coughing lasting for two weeks. (R. 511.) Dr.

Malmazada prescribed Augmentin and Prednisone. (R. 512.)

On March 6, 2014, Ortega consulted Dr. Varghese with complaints of joint pain, but stated that she experienced less stiffness than before with no joint swelling. (R. 850.) On March 10, 2014, Ortega visited Dr. Dorf with complaints of neck and right knee pain; Dr. Dorf prescribed Tramadol. (R. 410.) On March 17, 2014, Ortega visited Dr. Malmazada, who reported that Ortega's condition was improving, but she still exhibited signs of chronic obstructive pulmonary disease. (R. 507-09.) Ortega visited Dr. Dorf with complaints of tension headaches on April 28, 2014 (R. 409) and persistent dizziness on May 1, 2014 (R. 408). Ortega's examinations revealed that she had bilateral ronchi and normal psychiatric results. (R. 408.)

On May 5, 2014, Ortega was admitted to the emergency room for a fever and headaches. (R. 440-47.) Ortega was unable to tolerate the pain necessary to administer a lidocaine injection. (R. 501.) Ortega declined further treatment and insisted on being discharged against medical advice. (Id.) Dr. Dorf agreed to provide follow up consultations with Ortega. (R. 406-07, 501.) On May 13, 2014, Ortega underwent an abdominal and transabdominal pelvic ultrasound that revealed an enlarged spleen. (R. 430-31.) When reviewing her systems at the follow up consultation, Ortega's fever had subsided. (R. 439.) On May 22, 2014, Dr. Dorf informed Ortega that her recent blood work revealed evidence of an infection with the parasite toxoplasma gondii. (R. 421.) On May 28 and June 6, 2014, Ortega consulted an infectious disease specialist and also continued follow-up consultations with Dr. Malmazada. (R. 438, 448, 484-85, 493-96.)

On May 29, 2014, Ortega reported muscle tenderness and wheezing to Dr. Varghese. (R. 396.) Dr. Varghese noted that Ortega's rheumatoid arthritis appeared stable with no active synovitis. (Id.) Dr. Varghese filled out an arthritis medical source statement, describing Ortega's prognosis to be "good, RA is not very active now," with no active joint findings other than reduced

grip strength. (R. 390.) When asked to estimate Ortega's functional limitations if placed in a competitive work situation, Dr. Varghese wrote that Ortega could walk five blocks without rest or severe pain, sit one hour at a time, stand one hour at a time, and stand and walk for about two hours in an eight-hour work day. (R. 391.) Dr. Varghese indicated that Ortega requires a job that permits shifting positions at will and allows for 10 minutes of walking every 90 minutes within the work day. (R. 391-92.) Ortega would be required to take unscheduled breaks every two hours. (R. 392.) She could occasionally lift and carry 10 pounds. (Id.) She could never twist, rarely bend, occasionally crouch or squat, and occasionally climb ladders or stairs. (Id.) She had no significant limitations with reaching, handling, or fingering. (Id.) She would likely be "off task" (defined as time where symptoms would be severe enough to interfere with attention and concentration needed to perform even simple work tasks) for 15% of the work day but was capable of low stress work. (R. 393.) If employed full time, she would likely have to miss roughly two days of work per month. (Id.)

On July 7, 2014, Ortega followed up with Dr. Varghese and exhibited full range of motion in all joints. (R. 489.)

On June 12, 2014, Dr. Marc Tarle completed a mental medical source statement, stating that he met with Ortega every one to three months from April 24, 2012 to June 10, 2014. (R. 398-403.) He diagnosed Ortega with mood disorder and generalized anxiety disorder, and prescribed Zoloft and Xanax. (R. 398.) Dr. Tarle described his clinical findings to be mood instability (sad, irritable and anxious), impaired impulse control, and limited capacity to handle routine stress. (Id.) He opined that Ortega had limited but satisfactory ability to understand, remember and carry out very short and simple instructions, ask simple questions or request assistance, and be aware of normal hazards and take appropriate precautions. (R. 400.) He opined

that she was seriously limited, but not precluded, from being able to remember work-like procedures, maintain attention for two hour segments, make simple work-related decisions, and respond appropriately to changes in a routine work setting. (Id.) She was unable to maintain regular attendance and punctuality, sustain an ordinary routine without special supervision, perform at a consistent pace, accept instructions and respond appropriately to supervisors, get along with co-workers or peers, or deal with normal work stress. (Id.) She became easily overwhelmed in routine social or vocational situations, was not able to function within social norms and was prone to irritability and sadness. (R. 401.) On average, Dr. Tarle anticipated that Ortega's impairments would cause her to miss more than four days per month. (R. 402.)

On June 17, 2014, the ALJ posed several questions to Dr. Tarle for clarification. (See R. 466.) On July 3, 2014, Dr. Tarle responded, expressing that Ortega can understand and remember simple instructions most of the time, although her capacity could be impaired when becoming moody or irritable. (Id.) He stated that it was difficult for Ortega to make judgments on complex work decisions. (Id.) However, Ortega could interact with the public, supervisors, and coworkers in a general sense, although she could become argumentative or impulsive with extended interactions. (Id.) Her ability to handle typical work-related situations, work-related stress and changes in routine work setting would depend on the severity of her mood disorder, which tended to fluctuate. (Id.) Ortega had marked limitations in stress tolerance and moderate limitations in decision-making. (R. 467.) Ortega's GAF score was 55. (Id.)

**ALJ Gonzalez's Decision**

On December 29, 2014, ALJ Gonzalez denied Ortega's application for benefits. (R. 16-33.) ALJ Gonzalez applied the appropriate five step legal analysis. (R. 20-21.) First, he found that Ortega "has not engaged in substantial gainful activity since August 1, 2011, the alleged onset

date." (R. 21.) Second, ALJ Gonzalez found that Ortega had the "following severe impairments: rheumatoid arthritis, fibromyalgia, cervical spine disc herniation, lumbar spine disc protrusion and bulge, sacroiliitis, migraine headaches, asthma, obesity, anxiety disorder, mood disorder, and pain disorder and adjustment disorder." (Id.) Third, ALJ Gonzalez found that Ortega did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Id.) ALJ Gonzalez specifically addressed Ortega's bronchial asthma, shortness of breath, rheumatoid arthritis, fibromyalgia, sacroiliitis, and conditions of the cervical and lumbar spines, concluding that those impairments were not severe based on electrodiagnostic studies, neurologic examinations, pulmonary function tests and X-rays yielding unremarkable results, reports of normal gait and station, lack of reports specifying complaints or limitations related to her obesity, and lack of evidence of intubation. (R. 22-23.) ALJ Gonzalez also concluded that Ortega's mental impairments were not severe based on her activities of daily living, her social interactions with her family, her cooperative demeanor in psychiatric examinations, and her lack of reported episodes of decompensation. (Id.)

ALJ Gonzalez determined that Ortega had the residual functional capacity ("RFC") to

> perform sedentary work as defined in 20 CFR 404.1567(a), except that she is limited to frequently flexing, extending, and rotating her neck; occasionally stooping, crouching, kneeling, and climbing stairs; and occasionally interact with supervisors, coworkers, and the general public; must avoid concentrated exposure to dust, fumes, and noxious gases; and can understand, remember, and carry out only simple and routine work and adapt only to routine workplace changes.

(R. 24.)

ALJ Gonzalez accorded "some" weight to Dr. Gopal's opinion that Ortega was able to walk more than one block and lift up to ten pounds, and noted no sitting limitations. (R. 27.) ALJ

Gonzalez noted Dr. Gopal's lengthy relationship with Ortega as her treating physician. (Id.) Dr. Gopal's opinions were consistent with the medical evidence of record, insofar as they indicate that Ortega is capable of sedentary work. (Id.)

ALJ Gonzalez accorded "some" weight to Dr. Engelberg Damari's opinion that Ortega was capable of decision-making, and understanding and performing simple tasks, and had mild impairments in performing complex tasks, engaging in social interactions, and tolerating stress. (Id.) ALJ Gonzalez slightly discounted her opinion because her conclusions were based upon a single encounter and were partially consistent with the medical evidence of record. (R. 27-28.)

ALJ Gonzalez accorded "great" weight to Dr. Fkiaras' consultative opinion that Ortega was restricted from any activities requiring great exertion, had a moderate-to-marked limitation in bending, should avoid prolonged standing, had a moderate limitation in climbing stairs, should avoid respiratory irritants, and had a mild limitation reaching with her bilateral upper extremities. (R. 28.) Although Dr. Fkiaras' opinion was based upon a single examination, ALJ Gonzalez found that it was consistent with the record medical evidence, i.e., that "there is no evidence to suggest that [Ortega's physical limitations] would impact her ability to sit and perform sedentary work." (Id.)

ALJ Gonzalez accorded "great" weight to Dr. Ferrin's consultative opinion that Ortega might benefit from a work environment where she was not required to have intensive contact with the public and that she was capable of routine interactions with coworkers and supervisors. (Id.) Although Dr. Ferrin did not examine Ortega in person and did not have the complete record available to him, ALJ Gonzalez noted that Dr. Ferrin was an expert in psychology and his opinion was consistent with all of the evidence of record. (Id.)

ALJ Gonzalez accorded "great weight" to Dr. Varghese's opinion regarding Ortega's

abilities to stand, walk, lift, and carry because it was well-supported by the record evidence. (R. 29.) However, ALJ Gonzalez accorded "little weight" to Dr. Varghese's opinion that Ortega would likely be off-task 15% of a typical workday and would be absent about two days per month because of impairments or treatment, and required a position that allowed for shifting positions at will based on Ortega's alleged sitting limitations. (Id.) ALJ Gonzalez discounted that portion of Dr. Varghese's opinion because it was inconsistent with Dr. Fkiaras' opinion that noted no sitting limitations, and was not supported by the record. (Id.) Furthermore, Dr. Varghese failed to respond to an SSA request to clarify her opinion. (Id.)

ALJ Gonzalez accorded "very little" weight to Dr. Tarle's initial opinion that Ortega had serious mental functioning and social impairments, as the other record evidence did not support such severe limitations. (R. 30.) ALJ Gonzalez accorded "more" weight to Dr. Tarle's clarification letter because it was supported by substantial evidence such as Dr. Damari's and Dr. Ferrin's opinions, and because Ortega's GAF score of 55 suggested only moderate symptoms. (Id.)

At the fourth step, ALJ Gonzalez determined that Ortega is unable to perform any past relevant work (R. 31), but that given Ortega's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy" that she could perform (R. 32). ALJ Gonzalez noted that Ortega is considered an individual of younger age, has a high school education, and is able to communicate in English. (R. 32.) ALJ Gonzalez relied on vocational expert Komarov's testimony that a person with these characteristics and limitations could work as an addresser, document preparer, semiconductor bonder, or final assembler. (R. 32-33.) Accordingly, ALJ Gonzalez concluded that Ortega has not been "under a disability" as defined in the Social Security Act, from August 1, 2011 through December 29, 2014. (R. 33.)

# ANALYSIS

## I.      THE APPLICABLE LAW

### A.      Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart v. Walton, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); Impala v. Astrue, 477 F. App'x 856, 857 (2d Cir. 2012).[1]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S.

---

[1]      See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Surgeon v. Comm'r of Soc. Sec., 190 F. App'x 37, 39 (2d Cir. 2006); Rodriguez v. Barnhart, 163 F. App'x 15, 16 (2d Cir. 2005); Malone v. Barnhart, 132 F. App'x 940, 941 (2d Cir. 2005); Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).

Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270.[2]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[3]

**B.      Standard Of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support such determination. E.g., 42 U.S.C. § 405(g); Giunta v. Comm'r of Soc. Sec., 440 F. App'x 53, 53 (2d Cir. 2011).[4] "'Thus, the role of the district court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y.

---

[2]      See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 111; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472; Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79.

[3]      See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62.

[4]      See also, e.g., Prince v. Astrue, 514 F. App'x 18, 19 (2d Cir. 2013); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

July 26, 2002) (Peck, M.J.).[5/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[6/] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[7/]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); see also, e.g., Douglass v. Astrue, 496 F. App'x 154, 156 (2d Cir. 2012); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Tejada v. Apfel, 167 F.3d at 773 (citing cases).

---

[5/] See also, e.g., Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[6/] See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[7/] See also, e.g., Campbell v. Astrue, 465 F. App'x 4, 6 (2d Cir. 2012); Veino v. Barnhart, 312 F.3d at 586.

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims. 20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987). The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability. If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further. [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted).[8/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant can perform considering not only his medical capacity but also his age, education and training. See,

---

[8/]     Accord, e.g., Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774; see also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[9/]

> **C.     The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2); see, e.g., Rugless v. Comm'r of Soc. Sec., 548 F. App'x 698, 699-700 (2d Cir. 2013); Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010); Colling v. Barnhart, 254 F. App'x 87, 89 (2d Cir. 2007); Lamorey v. Barnhart, 158 F. App'x 361, 362 (2d Cir. 2006).

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well-supported" by other medical evidence), the ALJ must consider the following factors in determining the weight to be given such an opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant.  20 C.F.R. § 404.1527(c)(2)-(6); see, e.g., Cichocki v. Astrue, 534 F. App'x 71, 74 (2d

---

[9/]     See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

Cir. 2013); Gunter v. Comm'r of Soc. Sec., 361 F. App'x 197, 197 (2d Cir. 2010).[10]

When a treating physician provides a favorable report, the claimant "is entitled to an express recognition from the [ALJ or] Appeals Council of the existence of [the treating physician's] favorable . . . report and, if the [ALJ or] Council does not credit the findings of that report, to an explanation of why it does not." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999); see, e.g., Cichocki v. Astrue, 534 F. App'x at 75; Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (ALJ's failure to consider favorable treating physician evidence ordinarily requires remand pursuant to Snell but does not require remand where the report was "essentially duplicative of evidence considered by the ALJ"); Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or the Secretary, but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable [reviewing courts] to decide whether the determination is supported by substantial evidence." (citations omitted)); Ramos v. Barnhart, 02 Civ. 3127, 2003 WL 21032012 at *7, *9 (S.D.N.Y. May 6, 2003) (The ALJ's "'failure to mention such [treating physician report] evidence and set forth the reasons for his conclusions with sufficient specificity hinders [this Court's] ability . . . to decide whether his determination is supported by substantial evidence.'").

The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).[11]

---

[10] See also, e.g., Foxman v. Barnhart, 157 F. App'x 344, 346-47 (2d Cir. 2005); Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998).

[11] Although not relevant here, the Court notes that the regulations governing the "treating physician rule" recently changed as to claims filed on or after March 27, 2017. See 20
(continued...)

## II.   APPLICATION OF THE FIVE STEP SEQUENCE

### A.   Ortega Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Ortega was engaged in substantial gainful activity after her application for DIB.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.  ALJ Gonzalez's conclusion that Ortega did not engage in substantial gainful activity during the applicable time period (see pages 18-19 above) is not disputed and benefits Ortega.  (See generally Dkt. No. 18: Comm'r Br.)  The Court therefore proceeds with the analysis.

### B.   Ortega Demonstrated "Severe" Impairments That Significantly Limited Her Ability To Do Basic Work Activities

The second step of the analysis is to determine whether Ortega proved that she had a severe impairment or combination of impairments that "significantly limit[ed her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1522(b).  "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1522(b)(1)-(6).

ALJ Gonzalez determined that Ortega's severe impairments were rheumatoid arthritis, fibromyalgia, cervical spine disc herniation, lumbar spine disc protrusion and bulge, sacroiliitis,

---

[11/]   (...continued)
C.F.R. §§ 404.1527, 404.1520c; Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819 at *5844, *5867-68 (Jan. 18, 2017).

migraine headaches, asthma, obesity, anxiety disorder, mood disorder, and pain disorder and adjustment disorder. (See page 19 above.) ALJ Gonzalez's findings regarding the step-two severity of these impairments benefit Ortega, and Ortega does not contest those findings. (See generally Dkt. No. 16: Ortega Br.) Accordingly, the Court proceeds to the third step of the five-part analysis.

**C.     Ortega Did Not Have A Disability Listed In Appendix 1 Of The Regulations**

The third step of the five-step test requires a determination of whether Ortega had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Gonzalez found that notwithstanding Ortega's severe impairments, she "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)." (R. 21.) ALJ Gonzalez compared the medical evidence in the record to the criteria in listings 1.04 (spinal disorder), 3.03 (chronic asthmatic bronchitis), 12.04 (mental impairments), and 12.06 (mental impairments); he found that Ortega did not meet the necessary criteria for any of these listings. (R. 21-24.) Because ALJ Gonzalez's finding that Ortega's impairments do not meet or medically equal the listed conditions is not disputed by the parties (see generally Dkt. No. 16: Ortega Br.; Dkt. No. 18: Comm'r Br.), the Court proceeds with the five-step analysis.

**D.     ALJ Gonzalez's Credibility and RFC Determinations**

Before proceeding to step four, the Court will address ALJ Gonzalez's credibility and

residual functional capacity ("RFC") determinations.

### 1. **Credibility Determination**

Because subjective symptoms only lessen a claimant's RFC where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." Moulding v. Astrue, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); see, e.g., Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.' Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (citations omitted)); Brown v. Comm'r of Soc. Sec., 310 F. App'x 450, 451 (2d Cir. 2009) ("'Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.'").[12/]  In addition, "courts must show special deference to an

---

[12/]    See also, e.g., Rivers v. Astrue, 280 F. App'x 20, 22 (2d Cir. 2008) (same); Thompson v. Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime, and her daily routine"); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such (continued...)

ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[13/]

When an ALJ determines that a claimant's own statements regarding her symptoms are not supported by the record, that "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029 at *9 (Mar. 16, 2016). The regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably

---

[12/] (...continued)
symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[13/] Accord, e.g., Campbell v. Astrue, 465 F. App'x 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

> be accepted as consistent with the objective medical evidence and other evidence of record. The ALJ must consider statements the claimant or others make about his impairment(s), his restrictions, his daily activities, his efforts to work, or any other relevant statements he makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citation & brackets omitted) (citing 20 C.F.R. §§ 404.1529(a), 404.1529(b), and the now-superseded SSR 96-7p); see also SSR 16-3p, 2016 WL 1119029 at *2; Burgess v. Colvin, 15 Civ. 9585, 2016 WL 7339925 at *11 (S.D.N.Y. Dec. 19, 2016) (quoting SSR 16-3p for an explanation of the two-step process for assessing claimants' statements about their symptoms).

In March 2016, the SSA released SSR 16-3p, which provides updated guidance on evaluating a claimant's claims about the work-preclusive nature of her symptoms. See generally SSR 16-3p, 2016 WL 1119029; accord, e.g., Duran v. Colvin, 14 Civ. 8677, 2016 WL 5369481 at *13 n.27 (S.D.N.Y. Sept. 26, 2016) ("SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), and clarifies the policies set forth in the previous SSR.").

> The purpose of [SSR 16-3p] is to provide "guidance about how [to] evaluate statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims." S.S.R. 16-3P, 2016 WL 1119029, at *1. The Ruling supersedes . . . S.S.R. 96-7p, which placed a stronger emphasis on the role of the adjudicator to make a "finding about the credibility of the individual's statements about the symptom(s) and its functional effects." S.S.R. 96-7P, 1996 WL 374186, at *1. In contrast, S.S.R. 16-3p espouses a more holistic analysis of the claimant's symptoms, and "eliminate[s] the use of the term 'credibility'" from sub-regulation policy. S.S.R. 16-3P, 2016 WL 1119029, at *1. The Commissioner notes that the "regulations do not use this term," and by abandoning it, "clarif[ies] that subjective symptom evaluation is not an examination of an individual's character." Id.

Acosta v. Colvin, 15 Civ. 4051, 2016 WL 6952338 at *18 (S.D.N.Y. Nov. 28, 2016).

Ortega testified that her RA produced "burning" and "numbing" sensations in her hands, wrists and fingers, causing an inability to bend at the joints and an inability to hold or carry

anything. (See page 3 above.) Ortega claimed that disc problems in her back prevented her from standing up straight and produced pain when sitting or standing for long periods of time that radiated to her arms and legs. (Id.) Ortega said that she occasionally was unable to leave her bed due to severe pain in her hands and back. (Id.) Ortega testified that she suffered from stress-induced migraine headaches at least five times a month that lasted at least twenty-four hours. (Id.) Ortega testified to being unable to walk her child to the bus stop, or stand for more than ten minutes engaging in the same task without having to sit due to back pain. (Id.) She testified to being prone to irritability and thoughts of violence when engaging in typical interactions at work or at the grocery store, that would lead to her being fired or jailed if she had to return to work. (Id.)

Ortega argues that ALJ Gonzalez improperly discounted Ortega's credibility because the record "shows a comprehensive treatment over time of [her] impairments for spine, joint, back, muscle pain, stiffness, stress, depression and anxiety." (Dkt. No. 16: Ortega Br. at 7.)[14] ALJ Gonzalez found that Ortega's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Ortega's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." (R. 25.) After reviewing the relevant medical records (R. 25-31), ALJ Gonzalez gave several reasons for discounting Ortega's credibility (R. 30-31). ALJ Gonzalez first found that "there is little evidence in this record that the

_____

[14] Apart from this generic argument, Ortega does not identify any specific testimony or statements that ALJ Gonzalez improperly discounted. (See generally Ortega Br.) Moreover, most of Ortega's remaining arguments are bullet point sentences devoid of any factual application to the relevant law. To the extent Ortega's counsel has taken the "'spaghetti approach'" and invites the Court to parse through the entire record to make his arguments for him, the Court declines that invitation. Indep. Towers of Washington v. Washington, 350 F.3d 925, 929 (9th Cir. 2003) ("When reading [petitioner's] brief, one wonders if [petitioner], in its own version of the 'spaghetti approach,' has heaved the entire contents of a pot against the wall in hopes that something would stick. We decline, however, to sort though the noodles in search of [petitioner's] claim.").

claimant's daily activities have been restricted to the degree the claimant alleges based upon [her] impairments . . . ." (R. 30.) ALJ Gonzalez next found that "although the claimant has received treatment for the allegedly disabling impairments, that treatment has been essentially routine and/or conservative in nature." (Id.) ALJ Gonzalez wrote that, "[w]hile the claimant received medication, physical therapy, and injections, she has not exhausted conservative treatment and she has not undergone any surgery for her severe impairments." (Id.) ALJ Gonzalez acknowledged that the record contained "opinions from treating or examining physicians indicating that the claimant is currently disabled," but found that these opinions were not supported by substantial evidence. (R. 30-31.) Finally, ALJ Gonzalez found that Ortega "betrayed no evidence of debilitating symptoms while testifying at the hearing." (R. 31.)[15/]

### i.   Ortega's Physical Impairments

ALJ Gonzalez appropriately applied the two-part credibility test and supported his findings with substantial evidence in Ortega's treatment records regarding her physical impairments. As to activities of daily living, ALJ Gonzalez relied on Ortega's statements in her February 25, 2013 function report, April 15, 2013 psychiatric evaluation with Dr. Fredelyn Damari, and April 17, 2013 evaluation with Dr. John Fkiaras. (R. 30.) Ortega claimed on these dates that she could dress, bathe, and groom herself, engage in childcare, prepare simple meals up to four times per week, do simple household chores with breaks, drive a car short distances, and shop for food while accompanied

---

[15/]   Ortega argues that ALJ Gonzalez improperly found that her complaints regarding her symptoms were not credible to the extent that they were inconsistent with the RFC assessment. (Ortega Br. at 7.) The Court has disapproved of ALJs employing such backwards reasoning in the past. See, e.g., Campbell v. Comm'r of Soc. Sec., 15 Civ. 2773, 2016 WL 6462144 at *13 & n.15 (S.D.N.Y. Nov. 1, 2016) (Peck, M.J.) (citing cases). Nevertheless, remand is inappropriate here because the credibility determination, and decision as a whole, were supported by substantial evidence and a careful review of the medical records. Campbell v. Comm'r of Soc. Sec., 2016 WL 6462144 at *13.

once a week.  (See pages 2, 12.)

    As to the remaining medical records, Ortega began seeking regular treatment for her back, neck and joint pain in August 2012.  (See page 8 above.)  Ortega's records from August 29, 2012 through January 7, 2013 document diminished range of motion, tenderness and pain in her back, neck and spine.  (See pages 8-10 above.)  However, the severity of Ortega's symptoms during these visits often fell in the mild to moderate range, and the records include other normal findings throughout.  (See R. 308-12 (8/29/12: no apparent acute or chronic distress with normal gait and station with unspecified degree of spinal tenderness, and mild to moderate neck and back pain); R. 462 (9/4/12: unspecified degree of lumbar spine tenderness and mild restrictions in range of motion of shoulders and hip joints, with no significant joint tenderness, joint synovitis, or effusion); R. 361-63 (10/8/12: limited range of motion in lumbar spine and neck, but brisk reflexes and normal gait, station, strength in upper and lower extremities, and range of motion in shoulder joints); R. 314-17 (10/24/12: mild to moderate tenderness with full range of motion in right hip and thigh, and mild to moderate tenderness with mildly limited range of motion in her left hip and thigh); R. 349-51 (1/7/13: upper back swelling, limited range of motion in lower back and cervical spine and trigger points in trapezius and paraspinal area, but normal gait and motor strength, and brisk reflexes).)

    On February 18, March 18, and March 25, 2013, Ortega stated that some of her symptoms had not improved and others had worsened.  (See page 11 above.)  On April 17, 2013, Dr. John Fkiaras noted that Ortega had a slow gait, could not walk on heels and toes, and could only squat one third of the way down.  (See page 12 above.)  However, Dr. Fkiaras' physical examination revealed that Ortega was in no acute distress, had a normal stance, did not use any assistive devices, did not require any help changing for the exam or getting on and off the exam table, had full range of motion of her hips, knees and ankles, and her joints were stable and nontender.  (See pages 12-13

above.)  Ortega furthermore informed Dr. Fkiaras that she cooked four times a week, cleaned once or twice a week, shopped weekly with assistance, cared for her children daily with assistance, groomed herself daily, watched TV, read, and listened to the radio.  (See page 12 above.)  The following week, on April 21, 2013, Ortega reported to Dr. Varghese that she continued to experience "some pain," but improved condition of her hips and knees.  (See page 13 above.)

On May 20, August 1, and August 5, 2013, Ortega reported increased pain in her knees, neck and back.  (See pages 14-15 above.)  During his orthopedic evaluation on August 1, 2013, Dr. Deutsch noted that the examination produced no overt discomfort and X-rays of the cervical spine revealed no degenerative changes or narrowed disc spaces.  (See page 15 above.)  On August 5, 2013, however, Dr. Gopal noted that Ortega had not improved with conservative treatments and referred her for corrective spine surgery; Ortega never had surgery and Dr. Gopal noted in his opinion that Ortega could lift up to ten pounds and walk more than one block.  (Id.)

The remainder of the medical records contain Ortega's treatment notes with Dr. Varghese that discuss Ortega's improving rheumatoid arthritis and joint pain.  (See R. 852 (10/21/13: reporting improved condition of joints despite several hours of stiffness in the morning); R. 851 (12/30/13: noting Ortega's RA was "relatively stable"); R. 850 (3/6/14: joint pain, but less stiffness than before with no swelling).  On May 29, 2014, Dr. Varghese noted that Ortega's rheumatoid arthritis appeared stable with no active synovitis, and Ortega reported no active joint findings other than reduced grip strength.  (See pages 16-17 above.)  Dr. Varghese completed an arthritis medical source statement, describing Ortega's prognosis to be "good, RA is not very active now."  (See page 16 above.)  When asked to estimate Ortega's functional limitations if placed in a competitive work situation, Dr. Varghese wrote that Ortega could walk five blocks without rest or severe pain, lift up to ten pounds occasionally, and had no significant limitations with reaching, handling, or fingering.

(See page 17 above.)  Finally, on July 7, 2014, Ortega followed up with Dr. Varghese and exhibited full range of motion in all joints.  (Id.)

These records support ALJ Gonzalez's credibility determination.  For example, Ortega testified that she could not bend her joints or hold anything due to RA, and that she was unable to walk her child to the bus stop or stand for more than ten minutes engaging in the same task without having to sit due to back pain.  ALJ Gonzalez noted, however, that Ortega's activities of daily living belied these alleged symptoms.  Furthermore, although some of Ortega's treatment notes reflect severe back, spine and neck pain, others do not.  The records from August 29, 2012 through January 7, 2013 indicate some symptoms in the mild to moderate range, and include other normal findings.  An examination several months later on August 1, 2013 revealed no overt discomfort and X-rays of the cervical spine revealed no degenerative changes or narrowed disc spaces.  Despite Dr. Gopal's spinal surgery recommendation on August 5, 2013, ALJ Gonzalez noted that Ortega never had surgery and Dr. Gopal stated in the same opinion that Ortega could walk over a block and lift up to ten pounds.  (See page 34 above.)  Ortega's RA and joint pain had also improved during her last visits with Dr. Varghese from October 2013 through July 2014.  As to Ortega's inability to sit for long periods, ALJ Gonzalez cited Dr. Gopal's and Dr. Fkiaras' opinions that noted no sitting limitations, despite listing other physical restrictions.  (R. 27-28; see cases cited at page 42 n.16 below.)  ALJ Gonzalez appropriately found that Ortega's subjective complaints as to her physical limitations were not supported by the record evidence.

### ii.    Ortega's Psychiatric Impairments

ALJ Gonzalez's credibility findings with respect to Ortega's psychiatric impairments also comported with the two step analysis above.  Ortega's testimony primarily addressed her alleged inability to function in public settings, relate adequately with others or otherwise cope with stress.

(See page 3 above.) However, as ALJ Gonzalez noted, the consultative opinions from Drs. Damari and Ferrin and treating physician Dr. Tarle did not reflect such severe impairments.

On April 15, 2013, Dr. Damari observed that Ortega exhibited a cooperative demeanor, responsiveness to questions and adequate social skills, with mild impairments in her ability to maintain a schedule, relate adequately with others and appropriately deal with stress. (See page 12 above.) Dr. Damari concluded that the evaluation findings were consistent with Ortega's stress related issues, but did not seem significant enough to interfere with her ability to function on a daily basis. (Id.)

On May 10, 2013, Dr. Ferrin noted that Ortega suffered mild limitations in the following abilities: understanding and remembering detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, sustaining an ordinary routine without special supervision, working in coordination with others, making simple decisions, accepting criticism from supervisors, maintaining socially appropriate behavior, and using public transportation. (See pages 13-14 above.) Dr. Ferrin concluded that Ortega may benefit from a work environment where she is not required to have intensive contact with the public, but appeared capable of routine interactions with coworkers and supervisors. (See page 14 above.)

On June 12, 2014, Dr. Tarle completed a medical source statement that indicated more severe impairments. (See pages 17-18 above.) Dr. Tarle described Ortega's mood instability (sad, irritable and anxious), impaired impulse control, and limited capacity to handle routine stress. (See page 17 above.) Dr. Tarle opined that Ortega was seriously limited, but not precluded, from being able to remember work-like procedures, make simple work-related decisions, and respond appropriately to changes in a routine work setting. (See pages 17-18 above.) Ortega was further

unable to maintain regular attendance and punctuality, sustain an ordinary routine without special supervision, perform at a consistent pace, accept instructions and respond appropriately to supervisors, get along with co-workers or peers, or deal with normal work stress. (See page 18 above.) She became easily overwhelmed in routine social or vocational situations, was not able to function within social norms and was prone to irritability and sadness. (Id.)

In response to ALJ Gonzalez's request for clarification, Dr. Tarle wrote that Ortega can understand and remember simple instructions most of the time, although her capacity could be impaired when becoming moody or irritable. (Id.) Dr. Tarle stated that it was difficult for Ortega to make judgments on complex work decisions. (Id.) However, Ortega could interact with the public, supervisors, and coworkers in a general sense, although she could become argumentative or impulsive with extended interactions. (Id.) Her ability to handle typical work-related situations, work-related stress and changes in routine work setting would depend on the severity of her mood disorder, which tended to fluctuate. (Id.) Dr. Tarle opined that Ortega had marked limitations in stress tolerance and moderate limitations in decision-making. (Id.) He determined that Ortega's GAF score was 55. (Id.)

These records provide substantial evidence for ALJ Gonzalez's determination. Both consultative examiners assessed mild to moderate limitations in Ortega's social and occupational functioning. While Dr. Tarle assessed more severe symptoms, ALJ Gonzalez sought clarification and elicited Dr. Tarle's further observations that Ortega could generally interact with the public, supervisors and coworkers for a limited duration. ALJ Gonzalez also noted that Dr. Tarle assigned Ortega a GAF score of 55 (R. 30), indicating no more than "moderate symptoms or moderate difficulty in social, occupational, or school situations." Petrie v. Astrue, 412 F. App'x 401, 406 n.2 (2d Cir. 2011). ALJ Gonzalez accordingly supported his credibility determination with substantial

evidence in the record that undermined Ortega's claims regarding the severity of her psychiatric limitations.

### 2.    Residual Functional Capacity Determination

ALJ Gonzalez determined that Ortega had the RFC to

> perform sedentary work as defined in 20 CFR 404.1567(a), except that she is limited to frequently flexing, extending, and rotating her neck; occasionally stooping, crouching, kneeling, and climbing stairs; and occasionally interact with supervisors, coworkers, and the general public; must avoid concentrated exposure to dust, fumes, and noxious gases; and can understand, remember, and carry out only simple and routine work and adapt only to routine workplace changes.

(See page 19 above.)  Sedentary work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

ALJ Gonzalez's RFC determination was based on his review of Ortega's testimony and the medical evidence.  (R. 24-31.) ALJ Gonzalez noted, for example, that Ortega suffered from bronchial asthma, accompanied by shortness of breath and coughing.  (R. 25.)  From February 16, 2012 to June, 27, 2013, Ortega visited the ER seven times for shortness of breath, coughing, or wheezing.  (See pages 5-14 above.)  While ostensibly a significant treatment history, these records reflect that Ortega was often discharged on the same day as her admittance, sometimes against her doctor's advice.  (See id.)  Additionally, ALJ Gonzalez noted that there appears to be no evidence that Ortega had ever been intubated for these symptoms.  (R. 25.)  ALJ Gonzalez, moreover, properly accounted for Ortega's respiratory conditions in his RFC determination that stated Ortega "must avoid concentrated exposure to dust, fumes, and noxious gases."  (See page 19 above.)

Ortega does not suggest any other limitations in this regard not accounted for in ALJ Gonzalez's RFC restrictions.

With regard to Ortega's rheumatoid arthritis, fibromyalgia, sacroiliitis, and spinal pain, ALJ Gonzalez noted that Dr. Fkiaras's consultative examination revealed significant impairments affecting her neck, shoulders, back, hips, legs, and joints, but no evidence that suggested she would be unable to sit and perform sedentary work. (R. 28.) Despite exhibiting a slow gait and inability to walk on heels and toes, Ortega did not require any assistance changing for the examination or getting on and off the examination table, and was able to rise from a chair without difficulty. (R. 26.) And, as discussed above, Ortega's treatment notes from August 29, 2012 through January 7, 2013 showed some symptoms in the mild to moderate range with other normal findings; Dr. Gopal, despite recommending surgery, stated that Ortega could walk over a block and lift up to ten pounds; and Ortega's RA and joint pain had improved during her visits with Dr. Varghese from October 2013 through July 2014. (See pages 8-10, 15-18 above.)

ALJ Gonzalez further gave great weight to Dr. Varghese's May 29, 2014 opinion that Ortega could walk five blocks without rest or severe pain, occasionally lift and carry ten pounds, stand and walk for about two hours in an eight-hour work day, and had no significant limitations with reaching, handling, or fingering. (See pages 17, 20-21 above.) However, ALJ Gonzalez rejected Dr. Varghese's opinion that Ortega would be off task a significant portion of the workday, would be absent about two days per month because of impairments or treatment, and required a job that required shifting positions at will due to sitting limitations. (See pages 17, 21 above.) ALJ Gonzalez found that these limitations were unsupported by the record and inconsistent with Dr. Fkiaras' opinion that identified no sitting limitations. (See page 21 above.) Furthermore, when a request was sent to clarify her opinion, Dr. Varghese failed to respond. (Id.) ALJ Gonzalez also

gave some weight to Dr. Gopal's opinion—who noted Ortega could walk over a block, lift up to ten pounds and did not describe any sitting limitations—insofar as it indicated that Ortega was capable of sedentary work. (See page 19 above.)[16/]

Moreover, after finding that Ortega could perform sedentary work, ALJ Gonzalez further limited Ortega to "occasionally stooping, crouching, kneeling, and climbing stairs." (See page 19 above; see also R. 380 (Dr. Fkiaras' opinion noting "moderate-to-marked limitation in bending" and "moderate limitation climbing stairs"); R. 392 (Dr. Varghese's opinion noting Ortega could "occasionally" crouch or squat, and "occasionally" climb ladders or stairs). ALJ Gonzalez accordingly supported his RFC determination, including these additional restrictions, with substantial evidence in the record.

ALJ Gonzalez also properly accounted for Ortega's psychiatric impairments in his RFC determination. ALJ Gonzalez gave some weight to Dr. Damari's opinion that Ortega had mild impairments in her ability to maintain a schedule, relate adequately with others and appropriately

---

[16/] In assigning these opinions less than controlling weight, ALJ Gonzalez acknowledged that Drs. Varghese and Gopal were Ortega's treating physicians. (R. 27, 29.) While it is not clear that any other physician besides Dr. Varghese commented on Ortega's sitting limitations, ALJ Gonzalez appropriately relied on the record as a whole to determine that Dr. Varghese's opinion in this regard, and the remainder of Dr. Gopals' records inconsistent with a capacity for sedentary work, were entitled to less weight. See, e.g., Dumas v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983) ("The Secretary is entitled to rely not only on what the record says, but also on what it does not say."); Worthy v. Berryhill, No. 15-CV-1762, 2017 WL 1138128 at *9 (D. Conn. Mar. 27, 2017) ("The ALJ also properly relied on elements of [claimant's] longitudinal medical history that at least indirectly undermined the weight of Dr. Franklin-Zitzkat's opinion."); Guerrero v. Colvin, 16 Civ. 3290, 2016 WL 7339114 at *18 (S.D.N.Y. Dec. 19, 2016) (Peck, M.J.); 20 C.F.R. § 416.927(c)(4) (listing consistency "with the record as a whole" as a factor to determine weight of treating physician opinion). Moreover, as to ALJ Gonzalez's reliance on Dr. Fkiaras' opinion, "[i]t is well-settled that a consulting physician's opinion can constitute substantial evidence supporting an ALJ's conclusions." Suarez v. Colvin, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015) (Peck, M.J.) (citing cases).

deal with stress, and great weight to Dr. Ferrin's opinion that Ortega suffered from no more than moderate psychiatric limitations. (R. 25, 28.) However, ALJ Gonzalez gave very little weight to Dr. Tarle's initial opinion stating that Ortega had serious mental functioning and social impairments, as the record evidence did not support such severe limitations. (See page 21 above.) ALJ Gonzalez accorded "more" weight to Dr. Tarle's clarification letter because it was supported by substantial evidence such as the Damari and Ferrin opinions, and it assigned Ortega a GAF score of 55 suggesting no more than moderate symptoms. (See page 21 above.) In his clarification letter, Dr. Tarle further wrote that Ortega could understand and remember simple instructions most of the time, and could interact with the public, supervisors, and coworkers in a general sense, albeit not for extended periods. (See page 18 above.)

ALJ Gonzalez acknowledged that Dr. Tarle was Ortega's treating physician, and appropriately weighed his opinion in light of its consistency with the record as a whole, including the clarification letter. (R. 30.) Moreover, ALJ Gonzalez adequately accounted for Ortega's psychiatric limitations by limiting Ortega to occasional interaction with supervisors, coworkers, and the general public, carrying out only simple and routine work, and adapting only to routine workplace changes. (See page 19 above.) ALJ Gonzalez furthermore used a vocational expert to determine that a person with these limitations could perform four unskilled sedentary jobs. (R. 33, 77-78.) ALJ Gonzalez thus adequately accounted for Ortega's difficulty with stress, dealing with coworkers, supervisors and the general public, and making work-related decisions. (See pages 11-14, 17-18 above); see, e.g., Vasquez v. Berryhill, 16 Civ. 6707, 2017 WL 1592761 at *15 n.22 (S.D.N.Y. May 1, 2017) (Peck, M.J.); Landers v. Colvin, No. 14-CV-1090, 2016 WL 1211283 at *4 (W.D.N.Y. Mar. 29, 2016) ("The determination that Plaintiff is limited to 'simple, repetitive, and routine tasks' accounts for Plaintiff's limitations as to maintaining attention and concentration,

performing activities within a schedule, and maintaining regular attendance."); Steffens v. Colvin, No. 14-CV-06727, 2015 WL 9217058 at *4 (W.D.N.Y. Dec. 16, 2015) ("[T]he RFC finding requiring low contact with coworkers and the public adequately accounted for plaintiff's stress."). The Court thus finds that this aspect of ALJ Gonzalez's RFC determination was supported by substantial evidence.[17/]

### E.  Ortega Did Not Have The Ability to Perform Her Past Relevant Work

The fourth step of the five-step analysis asks whether Ortega had the residual functional capacity to perform her past relevant work. (See page 25 above.) Ortega previously worked as a titled receptionist, unit clerk, medical record coder and bus monitor. (See page 2 above.) ALJ Gonzalez concluded that Ortega did not have the ability to perform her past relevant work. (See page 21 above.) Because this finding favors Ortega and is not contested by either party, the Court proceeds to the fifth and final step of the analysis.

### F.  There Are Jobs In Substantial Numbers In The Economy That Ortega Can Perform

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training." Parker v. Harris, 626 F.2d 225, 231 (2d Cir.

---

[17/]  Ortega argues that ALJ Gonzalez "failed to obtain updated and detailed medical source statements from the treating and examining doctors regarding [Ortega's] ability to perform relevant work-related functions . . . ." (Dkt. No. 16: Ortega Br. at 8.) To the contrary, ALJ Gonzalez obtained a clarification statement from Dr. Tarle with regard to Ortega's psychiatric impairments, and attempted to obtain further information from Dr. Varghese who did not respond. (See pages 18, 21 above.) Moreover, to the extent Ortega argues a duty to develop the record generally, she has identified no gaps in the record or otherwise shown that ALJ Gonzalez possessed an incomplete medical history. See, e.g., Vasquez v. Berryhill, 2017 WL 1592761 at *22-23 (citing cases).

1980).[18/]

In meeting his burden under the fifth step, the Commissioner:

> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid". The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy. Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations." Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); see also, e.g., Travers v. Astrue, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), R. & R. adopted, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); Lomax v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range

---

[18/] See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at 605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); Rosa v. Callahan, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.' Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing Bapp v. Bowen, 802 F.2d at 603, 605-06)); Suarez v. Comm'r of Soc. Sec., No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting Zabala v. Astrue, 595 F.3d at 411)).

ALJ Gonzalez properly relied on the testimony of vocational expert Sugi Komarov, who testified that an individual with Ortega's vocational profile and residual functional capacity would be unable to perform any of her previous work positions, but could be employed as an addresser, document preparer, semi-conductor bonder, or final assembler. (See page 21 above.) These jobs are all unskilled sedentary positions and the vocational expert testified that they all exist in significant numbers in the national economy. (R. 33, 78.) ALJ Gonzalez relied upon Komarov's testimony in reaching his step five determination when he specifically referred to those jobs in his findings. (See id.) Accordingly, ALJ Gonzalez's decision at step five was supported by substantial evidence. See, e.g., Frazier v. Comm'r of Soc. Sec., 16 Civ. 4320, 2017 WL 1422465 at *18 (S.D.N.Y. Apr. 20, 2017) (Peck, M.J.).

## **CONCLUSION**

For the reasons set forth above, the Commissioner's determination that Ortega was not disabled within the meaning of the Social Security Act during the period from August 1, 2011 to December 29, 2014 is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. No. 17) is <u>GRANTED</u> and Ortega's motion (Dkt. No. 15) is <u>DENIED</u>.

SO ORDERED.

Dated:     New York, New York
           May 30, 2017

_____
**Andrew J. Peck**
United States Magistrate Judge


Copies ECF to:      All Counsel